Howard J. Weg (State Bar No. 91057)
*hweg@pwkllp.com*
Lorie A. Ball (State Bar No. 210703)
*lball@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile:  (310) 552-3101

Proposed Counsel for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No: 2:11-bk-47919-BR |
| GATEWAY METRO CENTER, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor in Possession. | **MOTION FOR ORDER UNDER 11 U.S.C. §§ 363 AND 364: (A) AUTHORIZING DEBTOR TO INCUR POST-PETITION INDEBTEDNESS, (B) GRANTING SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS, AND (C) GRANTING SECURITY INTERESTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOHN F. PIPIA IN SUPPORT** |
| | <u>**Hearing:**</u> |
| | Date: Time: Place:  Courtroom <u>1668</u> 255 E. Temple Street Los Angeles, CA 90012 |

Gateway Metro Center, LLC (the "Company" or the "Debtor") hereby moves (the "Motion") for an order (a) authorizing the Debtor to incur post-petition indebtedness, (b) granting superpriority administrative status, and (c) granting security interests.  In support of the Motion, the Debtor submits the attached Memorandum of Points and Authorities and Declaration of John F. Pipia (the "Pipia

Declaration").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to obtaining credit and the use of property of the Estate and is, accordingly, a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D) and (M).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rule 4001-2.

### II.

### RELIEF REQUESTED

By this Motion, the Debtor seeks authority to obtain post-petition financing, to grant administrative superpriority status, and to grant security interests pursuant to section 364 of the Bankruptcy Code

### III.

### FACTS

A.    **General Background**

The Debtor is a California limited liability company that was formed on September 25, 2006. The Debtor's primary assets include (1) an approximately 121,462 square foot – 11 story office building and land located in the City of Pasadena, California ("Gateway Metro Center" formerly known as Gateway Tower), including rights to further develop the land on which the Gateway Metro Center is located, and (2) an approximately 8,000 square feet parcel of land immediately abutting the office building (the "Land").

In October, 2006, Allstate Life Insurance Company ("Allstate") loaned the Company $20,500,000 to purchase Gateway Tower, as it was known at that time (the "Loan").  The Loan is secured by, among other things, a Deed of Trust and an Assignment of Leases, Rents and Contracts.

Thereafter, the property was renamed Gateway Metro Center to sharpen and brand its identity, distinguish it from other property, and take advantage of its immediate proximity to the Metro Light Rail and bus transportation modes. Gateway Metro Center performed well in 2007, its first full year of operation. It ended the year with improved revenue levels and revenue sources and closely managed expenses. It was 100% leased as of December 31, 2007.

Since its ownership in 2006, the Company instituted programs to upgrade substantially and establish the property as a premier Class A Pasadena office location. The various programs were designed to improve the office building's physical and market image, both exterior and interior, to maximize rents and other revenues as well as tenant retention and to attract new tenants. Each of these goals was accomplished. During this time, the Company also began to explore ways in which it could monetize and take advantage of the substantial, additional buildable area available on the site. In that regard, the Company submitted a proposal to the City of Pasadena for comments on a conceptual proposal to add approximately 166,000 additional square feet of space to rentable building space to the site.

Moreover, in November 21, 2007, the Company acquired the Land next to Gateway Metro Center from the California Department of Transportation. The purchase of the Land enables the Company to add an additional 16,000 buildable square feet and/or additional parking. With the acquisition of the Land and recalculation of the land area, the new additional building area would be about an incremental 202,000 square feet, potentially creating a total project of over 323,000 square feet.

In 2008, the Company's revenues began to decline due to the severe global economic recession and the corresponding reduction in consumer spending and collapse in the real estate and capital markets.

The Company firmly believed at that time that due to the location of Gateway Metro Center, and the improvements, excellent tenant relations, and substantial marketing efforts made by management, the Company would be able to maintain the very high tenant occupancy level that was previously achieved. This, unfortunately, has not been the case. Substantial vacancies have occurred

for a variety of reasons mainly due to tenant consolidations, contractions, relocations, or tenant financial difficulties. The Company continues to market the property responsibly and aggressively and, despite extraordinarily difficult economic conditions, has successfully closed twenty-six separate lease transactions over the past nineteen months including renewals, expansions, and new leases. The building is currently approximately 60% leased. The Company has also looked for creative ways to increase its monthly revenues by instituting paid parking, and has also closely managed property expenses.

Foreseeing a deep and extended economic decline and with increased vacancy and resulting reduction in cash flow, in early 2008 the Company proactively contacted Allstate and requested that Allstate negotiate an extension or refinance of the Loan that is due in September 2011. The Company was informed, through Allstate's loan servicer, that Allstate would not consider such a proposal. Over the course of the next three years, the Company and its representatives made numerous and repeated attempts to engage Allstate in a negotiation over the Allstate Loan. The Company engaged FTI Consulting, Inc., a well-known real estate restructuring expert, to act as its financial advisor to advise the Company regarding alternatives and to contact Allstate in a further attempt to negotiate with Allstate. During this time, the Company made several restructuring proposals to Allstate in writing. All of these proactive efforts proved to be fruitless.

As a result, in May, 2011, the Company stopped making loan payments to Allstate with the intention to engage Allstate in a discussion about the Loan terms. The Debtor delivered a letter to Allstate to evidence its intention. Instead of engaging in a dialogue with the Debtor, on June 20, 2011, Allstate sent the Debtor a letter stating that the Company is in default under the Loan and that Allstate was reserving its rights under the Loan documents. Thereafter, on June 29, 2011, the Debtor received a letter from counsel for Allstate stating that the Company is in default and that Allstate may seek the appointment of a state court receiver. Additional attempts to negotiate the Loan terms with Allstate were rejected and on July, 15, 2011, Allstate publicly recorded a notice of default. The notice of default has affected the Debtor's marketing efforts to bring in new tenants.

In August, 2011, Flying Tigers, LLC ("Flying Tigers") loaned the Debtor $350,000 to cover

certain expenses incurred by the Debtor and for the potential costs associated with a bankruptcy filing (the "Prepetition Flying Tigers Loan").  The members of Flying Tigers are the same as the Debtor's members.  The Prepetition Flying Tigers Loan is secured by a junior lien on Gateway Metro Center including an interest in all rents, issues and profits thereof, and a senior lien on the Land.  The Debtor filed for chapter 11 bankruptcy protection on September 5, 2011 to utilize the chapter 11 process to maximize the value of its assets, which will include: (1) a continued effort to lease office space in Gateway Metro Center; and (2) a refinancing or restructuring of the Loan.  The Loan documents provide that the Loan matures on September 6, 2011.

**B.** **The Proposed Post-Petition Financing Agreement**

       1.    The Debtor's Need For Post-Petition Financing

       Concurrent with the filing of this Motion, the Debtor also filed a motion to use cash collateral in which Allstate and Flying Tigers claim an interest for the prepetition loans (the "Cash Collateral Motion").  If the Bankruptcy Court authorizes the Debtor to use the cash collateral, the Debtor anticipates that it should have sufficient cash from operations to pay all ordinary operating expenses and leasing and capital costs of the Estate during the pendency of the case.  Because cash collateral budgets are forward-looking and they can never be entirely accurate, it is unclear at the outset of the case whether the Debtor will have sufficient funds to pay certain additional reasonable and necessary costs of operating the Estate and the professional fees and costs associated with effectuating a restructuring.  Fluctuations in occupancy rates and unforeseen business circumstances could lead to additional cash flow requirements.

       Over the course of the bankruptcy case, the Debtor may need additional funds to pay for the costs of maintaining and operating the Gateway Metro Center, including maintenance and repair expenses, leasing costs and tenant improvement allowances.  In addition, while the Debtor has not yet received an invoice from the Los Angeles County Tax Collector, the Debtor anticipates that it will need to pay approximately $160,000 in property taxes in December, 2011.

       Moreover, during the case, the Debtor will need the assistance of capable professionals, including bankruptcy counsel, financial advisors, accountants and leasing brokers, to guide the Debtor through the bankruptcy process and assist with the Debtor's restructuring efforts.  The Debtor wishes to

provide assurance to professionals employed by the Debtor (the "Debtor's Professionals") that each such professional's allowed and approved fees and expenses will be paid.

Therefore, out of an abundance of caution, the Debtor desires to have debtor in possession financing in place to draw upon in the event that the Debtor does not have sufficient funds on hand to pay all such costs and expenses. The existence of the facility also will instill confidence in vendors, leasees, and other interested parties. Thus, the Debtor believes that establishing a back-up financing plan is reasonable considering the benefits to the Debtor's Estate.

The Debtor anticipates that it will be in a position to file a plan of reorganization and disclosure in the very near future. Given the speed at which this case is expected to proceed, the Debtor must focus its efforts on formulating and confirming a viable plan of reorganization. The establishment of the DIP Loan will ease the economic burdens of the Estate and enable the Debtor to focus on the plan and valuation process. Without post-petition financing, the Debtor may not be able to continue to operate its business in the ordinary course and consummate a plan of reorganization.

2.    The DIP Agreement

The Debtor, and Flying Tigers, as lender under the DIP Agreement ("Lender"), have negotiated the material terms of a Debtor In Possession Financing Agreement (the "DIP Agreement") in substantially the same form as the agreement attached to the Pipia Declaration as Exhibit A. The members of Flying Tigers are the same as the Debtor's members. The DIP Agreement provides that, in the event that the Debtor is unable to pay the administrative costs associated with the bankruptcy case including reasonable and necessary (1) costs incurred during the pendency of the case as set forth in any budget submitted in connection with the Cash Collateral Motion, and (2) allowed and approved fees and expenses of professionals employed by the Debtor, Lender will loan the Debtor up to $350,000 to cover such costs, fees and expenses.

The proposed DIP Agreement contains reasonable terms. Most significantly, the proposed loan (the "DIP Loan") (a) will be afforded "superpriority" administrative status in the Debtor's case pursuant to section 364(c) of the Bankruptcy Code, (b) will only be utilized in the event that the Debtor does not have sufficient cash on hand to cover reasonable and necessary costs and all allowed fees and expenses of the Debtor's Professionals, (c) will be secured by (1) a junior secured lien on Gateway

Metro Center and (2) a junior secured lien on the Land and such liens shall be subordinate to any

existing liens and any replacement liens granted in connection with the Cash Collateral Motion, (d)

bears a reasonable rate of interest (5%) and the Debtor will not be required to make any interest

payments until the maturity date of the DIP Loan, and (e) does not require any material financial

covenants.  It is unlikely that any third-party lender would be willing to advance on terms better than

the terms proposed by Lender.  At a minimum, any third-party lender likely would require interest

payments during the life of the loan, a priming lien ahead of Allstate's and Flying Tiger's pre-petition

alleged liens, and financial covenants.  See Pipia Declaration.

In accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Rule

4001-2, the following chart discloses the material provisions of the DIP Agreement.  No other

provision requiring disclosure pursuant to Bankruptcy Rule 4001 or Local Rule 4001-2 is included in

the DIP Agreement.

| TERM | DESCRIPTION | CITATION |
| --- | --- | --- |
| **Borrower** | Debtor, Gateway Metro Center, LLC, a California limited liability company | DIP Agreement Recitals; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c) |
| **DIP Lender** | Flying Tigers LLC, a California limited liability company | DIP Agreement Recitals; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |
| **Borrowing Limits** | Maximum of $350,000 | DIP Agreement Recitals and ¶ 1; Order, ¶ B; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |
| **Interest Rate** | 5% per annum, simple | DIP Agreement ¶ 1(f) and Promissory Note ¶ 1; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |

| TERM | DESCRIPTION | CITATION |
|------|-------------|----------|
| **Prepayment** | Amounts borrowed pursuant to the DIP Agreement may be repaid at any time during the term of the DIP Agreement without penalty or premium of any kind. | DIP Agreement ¶ 1(a); Order ¶ F; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |
| **Use of DIP Loan** | The proceeds of the DIP Loan shall be used by the Debtor to pay reasonable and necessary (1) costs of operation and (2) allowed and approved fees and expenses of professionals employed by the Debtor | DIP Agreement Recitals; Order ¶ D; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |
| **Terms of Advances** | (A) Following (i) the Effective Date, and (ii) entry by the Bankruptcy Court of an order allowing and approving, either on an interim or a final basis, the fees and expenses of the Debtor's Professionals, and to the extent that the Debtor does not have sufficient funds to pay allowed and approved fees and expenses of the Debtor's Professionals, the Debtor shall, within five (5) business days after entry of the Bankruptcy Court order, send a written request to Lender requesting that Lender advance to Debtor and pay to the Debtor's Professionals, on behalf of the Debtor, funds to pay all fees and expenses of the Debtor's Professionals in the amount allowed and approved by the Bankruptcy Court, and, within five (5) days of the date of such request, Lender shall advance to Debtor and pay to the Debtor's Professionals, on behalf of the Debtor, such fees and expenses; and (B) Following the Effective Date and, to the extent that the Debtor does not have sufficient funds to pay reasonable and necessary costs of operating the Debtor's business as set forth in any cash collateral budget, Debtor shall send a written request to Lender requesting that Lender advance to Debtor funds to pay such reasonable and necessary costs and, within five (5) business days of the date of such request, Lender shall, at its sole discretion, advance to Debtor such fees and expenses. | DIP Agreement ¶ 1(e); Order ¶ E; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c). |

| TERM | DESCRIPTION | CITATION |
|------|-------------|----------|
| **Secured Claims** | Pursuant to Bankruptcy Code Section 364(c)(2) and (3) and as provided for in the Bankruptcy Court order approving the DIP Agreement and the DIP Loan, the Debtor agrees Lender shall have (i) a junior secured lien on Gateway Metro Center and (ii) a junior secured lien on the Land.  The liens shall be subordinate to existing liens and replacement liens granted in connection with the Cash Collateral Motion. | DIP Agreement ¶ 1; Order ¶ G; Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(c). |
| **Superpriority Claim** | Pursuant to Bankruptcy Code Section 364(c)(1) and as provided for in the Bankruptcy Court order approving the DIP Agreement and the DIP Loan, the Debtor agrees that all obligations of the Debtor under the DIP Agreement shall constitute allowed "superpriority" administrative expenses in the chapter 11 case, having priority over all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b). | DIP Agreement ¶ 2; Order ¶ I; Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(c). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| **Events of Default** | An "Event of Default" shall be deemed to have occurred or exist under the DIP Agreement upon the occurrence and/or existence of any of the following conditions or events:  (a) The Debtor shall fail to pay the principal of or interest on the amount owing by the Debtor to Lender under the DIP Loan when due, or within ten (10) days thereafter; or (b) The appointment in the chapter 11 case of a trustee or of any examiner having expanded powers to operate all or any part of the Debtor's businesses or the conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or (c) The Bankruptcy Court enters an order granting any party relief from the automatic stay to exercise the party's rights and remedies against the Debtor or any of its assets; or (d) The chapter 11 case is dismissed without the Lender's consent; or (e) Debtor proposes to grant or the Bankruptcy Court approves the granting of a subsequent lien on the assets that secure the Lender's claims; or (f) Any party threatens to file or files any adversary proceeding, contested matter, suit, action or proceeding against the Lender in any state or federal court, including the Bankruptcy Court; or (g) Any party proposes a plan of reorganization for the Debtor without the prior written consent of the Lender or any plan of reorganization that has not been approved by the Lender is confirmed by the Bankruptcy Court. | DIP Agreement ¶ 4; Order ¶ H; Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(c). |

IV.

## ARGUMENT

**A.    The DIP Agreement Should Be Approved On The Terms Proposed**

The DIP Agreement should be approved because the terms thereof satisfy the requirements of section 364(c) of the Bankruptcy Code.  If a debtor in possession is unable to obtain credit on an unsecured priority basis, it may seek approval to obtain credit or incur debt (a) with an administrative expense "superpriority," or (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a lien on property of the estate that is junior to existing liens.  11 U.S.C. § 364(c).  It is well-established that the "statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  See, e.g., Bray v. Shenandoah Savings and Loan Association (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Rather, in determining whether to approve a post-petition financing transaction, the Court should give broad deference to the business decision of a chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Co. 1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for the benefit of the estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties").

The Debtor has demonstrated the need and the benefits of the proposed post-petition financing under the circumstances of this case.  Post-petition financing is necessary to allow the Debtor to pay reasonable and necessary costs and expenses of operating the Estate and retain experienced professionals who will represent the Debtor in all aspects of the chapter 11 case and assist the Debtor in its restructuring efforts.

In addition, the Debtor does not believe that the proposed post-petition financing is available from any source other than Lender.  In fact, the Debtor contacted two (2) different third party lenders regarding the possibility of obtaining a loan similar to that provided under the DIP Agreement.  Neither

of the lenders were willing to enter into a loan under similar or more favorable terms as the DIP

Agreement.  Moreover, Lender has stated that it is unwilling to extend credit to the Debtor on an

unsecured basis.  Lender requires superpriority administrative status and a junior secured interest to

support repayment of the DIP Loan. Therefore, having satisfied the requirements of section 364(c) of

the Bankruptcy Code, and having exercised reasonable business judgment in negotiating the terms of

the DIP Agreement, the Debtor should be authorized to enter into the DIP Agreement.

## IV.

## CONCLUSION

**WHEREFORE**, the Debtor requests that the Bankruptcy Court enter an Order, in

substantially the same form as Exhibit B attached to the Pipia declaration:

A.      Authorizing the Debtor to enter into the post-petition financing agreement with

Lender;

B.      Granting Lender an administrative expense claim in the amount due under the DIP

Agreement with priority over any and all administrative expenses of the kind specified in sections

503(b) or 507(b) of the Bankruptcy Code.

C.      Granting Lender a secured claim in the amount due under the DIP Agreement as set

forth herein;

D.      To the extent the Debtor does not have sufficient funds to pay the reasonable and

necessary (1) costs and expenses incurred during the bankruptcy case as set forth in any budget

submitted in connection with the Cash Collateral Motion, and (2) allowed fees and expenses of the

Debtor's Professionals, granting Lender authority to pay all such amounts, including Lender's

payment of all professional fees and expenses directly to the Debtor's Professionals, on behalf the

Debtor; and

E.      Granting such other and further relief as may be appropriate under the circumstances.

Dated: September 6, 2011                    PEITZMAN, WEG & KEMPINSKY LLP

By:      /s/  Lorie A. Ball
                    Lorie A. Ball
                    Howard J. Weg

Proposed Attorneys for the Debtor
and Debtor in Possession

## DECLARATION OF JOHN F. PIPIA

I, John F. Pipia, hereby declare:

1.      I am over 18 years of age and I am the President and Authorized Representative of the above-captioned debtor (the "Company" or the "Debtor").  Each of the facts contained in this declaration is based upon my personal knowledge and, if called as a witness to do so, I could competently testify thereto.  I make this declaration in support of the Motion For Order Under 11 U.S.C. §§ 363 And 364: (A) Authorizing Debtor To Incur Post-Petition Indebtedness, (B) Granting Superpriority Administrative Expense Status, And (B) Granting Security Interests (the "Motion").  Terms not otherwise defined herein are used as defined in the Motion.

2.      The Debtor is a California limited liability company that was formed on September 25, 2006.  The Debtor's primary assets include (1) an approximately 121,462 square foot – 11 story office building and land located in the City of Pasadena, California ("Gateway Metro Center" formerly known as Gateway Tower), including rights to develop further the land on which the Gateway Metro Center is located, and (2) an approximately 8,000 square feet parcel of land immediately abutting the office building (the "Land").

3.      In October, 2006, Allstate Life Insurance Company ("Allstate") loaned the Company $20,500,000 to purchase Gateway Tower, as it was known at that time (the "Loan").  The Loan is secured by, among other things, a Deed of Trust and an Assignment of Leases, Rents and Contracts.  Thereafter, the property was renamed Gateway Metro Center to sharpen and brand its identity, distinguish it from other property, and take advantage of its immediate proximity to the Metro Light Rail and bus transportation modes.  Gateway Metro Center performed well in 2007, its first full year of operation.  It ended the year with improved revenue levels and revenue sources and closely managed expenses.  It was 100% leased as of December 31, 2007.

4.      Since its ownership in 2006, the Company instituted programs to upgrade substantially and establish the property as a premier Class A Pasadena office location.  The various programs were designed to improve the office building's physical and market image, both exterior and interior, to maximize rents and other revenues as well as tenant retention and to attract new tenants.  Each of these

goals was accomplished.  During this time, the Company also began to explore ways in which it could monetize and take advantage of the substantial, additional buildable area available on the site.  In that regard, the Company submitted a proposal to the City of Pasadena for comments on a conceptual proposal to add approximately 166,000 additional square feet of rentable built space to the existing building.

5.      Moreover, in November 21, 2007, the Company acquired the Land next to Gateway Metro Center from the California Department of Transportation.  The purchase of the Land enables the Company to add an additional 16,000 buildable square feet and/or additional parking.  With the acquisition of the Land and recalculation of the land area, the new additional building area would be about an incremental 202,000 square feet, potentially creating a total project of over 323,000 square feet.

6.      In 2008, the Company's revenues began to decline due to the severe global economic recession and the corresponding reduction in consumer spending and collapse in the real estate and capital markets.

7.      The Company firmly believed at that time that due to the location of Gateway Metro Center, and the improvements, excellent tenant relations, and substantial marketing efforts made by management, the Company would be able to maintain the very high tenant occupancy level that was previously achieved.  This, unfortunately, has not been the case.  Substantial vacancies have occurred for a variety of reasons mainly due to tenant consolidations, contractions, relocations, or tenant financial difficulties.  The Company continues to market the property responsibly and aggressively and, despite extraordinarily difficult economic conditions, has successfully closed twenty-six separate lease transactions over the past nineteen months including renewals, expansions, and new leases.  The building is currently approximately 60% leased.  The Company has also looked for creative ways to increase its monthly revenues by instituting paid parking, and has also closely managed property expenses.

8.      Foreseeing a deep and extended economic decline and with increased vacancy and resulting reduction in cash flow, in early 2008 the Company proactively contacted Allstate and

requested that Allstate negotiate an extension or refinance of the Loan that is due in September 2011. The Company was informed, through Allstate's loan servicer, that Allstate would not consider such a proposal. Over the course of the next three years, the Company and its representatives made numerous and repeated attempts to engage Allstate in a negotiation over the Allstate Loan. The Company engaged FTI Consulting, Inc., a well-known real estate restructuring expert, to act as its financial advisor to advise the Company regarding alternatives and to contact Allstate in a further attempt to negotiate with Allstate. During this time, the Company made several restructuring proposals to Allstate in writing. All of these proactive efforts proved to be fruitless.

9.      As a result, in May, 2011, the Company stopped making loan payments to Allstate with the intention to engage Allstate in a discussion about the Loan terms. The Debtor delivered a letter to Allstate to evidence its intention. Instead, of engaging in a dialogue with the Debtor, on June 20, 2011, Allstate sent the Debtor a letter stating that the Company is in default under the Loan and that Allstate was reserving its rights under the Loan documents. Thereafter, on June 29, 2011, the Debtor received a letter from counsel for Allstate stating that the Company is in default and that Allstate may seek the appointment of a state court receiver. Additional attempts to negotiate the Loan terms with Allstate were rejected and on July, 15, 2011, Allstate publicly recorded a notice of default. The notice of default has affected the Debtor's marketing efforts to bring in new tenants.

10.      In August, 2011, Flying Tigers, LLC ("Flying Tigers") loaned the Debtor $350,000 to cover certain pre-petition expenses incurred by the Debtor for the potential costs associated with a bankruptcy filing (the "Prepetition Flying Tigers Loan"). The members of Flying Tigers are the same as the Debtor's members. The Prepetition Flying Tigers Loan is secured by a junior lien on Gateway Metro Center including an interest in all rents, issues and profits thereof, and a senior lien on the Land.

11.      The Debtor filed for chapter 11 bankruptcy protection on September 6, 2011 to utilize the chapter 11 process to maximize the value of its assets, which will include: (1) a continued effort to lease office space in Gateway Metro Center; and (2) a refinancing or restructuring of the Loan. The Loan documents provide that the Loan matures on September 6, 2011.

12.      Concurrent with the filing of this Motion, the Debtor also filed a motion to use cash

collateral in which Allstate and Flying Tigers claim an interest (the "Cash Collateral Motion").  If the Bankruptcy Court authorizes the Debtor to use the cash collateral, the Debtor anticipates that it should have sufficient cash from operations to pay all ordinary operating expenses and leasing and capital costs of the Estate during the pendency of the case.  Because cash collateral budgets are forward-looking and they can never be entirely accurate, it is unclear at the outset of the case whether the Debtor will have sufficient funds to pay certain additional reasonable and necessary costs of operating the Estate and professional fees and costs associated with effectuating a restructuring.  Fluctuations in occupancy rates and unforeseen business circumstances could lead to additional cash flow requirements.

13.     Over the course of the bankruptcy case, the Debtor may need additional funds to pay for the costs of maintaining and operating the Building, including maintenance and repair expenses, leasing costs and tenant improvement allowances.  In addition, while the Debtor has not yet received an invoice from the Los Angeles County Tax Collector, the Debtor anticipates that it may need to pay approximately $160,000 in property taxes in December, 2011.

14.     Moreover, during the case, the Debtor will need the assistance of capable professionals, including bankruptcy counsel, financial advisors, accountants and leasing brokers, to guide the Debtor through the bankruptcy process and assist with the Debtor's restructuring efforts.  The Debtor wishes to provide assurance to professionals employed by the Debtor (the "Debtor's Professionals") that each such professional's allowed and approved fees and expenses will be paid.

15.     Therefore, out of an abundance of caution, the Debtor desires to have debtor in possession financing in place to draw upon in the event that the Debtor does not have sufficient funds on hand to pay all such costs and expenses.  The existence of the facility also will instill confidence in vendors, leasees, and other interested parties.  Thus, the Debtor believes that establishing a back-up financing plan is reasonable considering the benefits to the Debtor's Estate.

16.     The Debtor anticipates that it will be in a position to file a plan of reorganization and disclosure in the very near future.  Given the speed at which this case is expected to proceed, the Debtor must focus its efforts on formulating and confirming a viable plan of reorganization.  The establishment of the DIP Loan will ease the economic burdens of the Estate and enable the Debtor to

1    focus on the plan and valuation process.  Without post-petition financing, the Debtor may not be able

2    to continue to operate its business in the ordinary course and consummate a plan of reorganization.

3         17.    The Debtor does not believe that the proposed post-petition financing is available from

4    any source other than Lender.  In fact, at my direction, Betty W. Ma, the Debtor's Senior Vice

5    President and Secretary, contacted two (2) third party lenders, Evertrust Bank and Citibank, regarding

6    the possibility of obtaining a loan similar to that provided under the DIP Agreement.  Neither of the

7    lenders was willing to enter into a loan under similar or more favorable terms as the DIP Agreement.

8    Moreover, Lender has stated that it is unwilling to extend credit to the Debtor on an unsecured basis.

9    Lender requires a superpriority administrative expense claim and a junior secured interest to support

10   repayment of the DIP Loan.

11

12   I declare under penalty of perjury that the foregoing is true and correct, to the best of my

13   knowledge, information and belief.

14       Executed this __6__ day of September, 2011, at Pasadena, California.

15

16

17       By: John F. Pipia

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## DEBTOR IN POSSESSION
## FINANCING AGREEMENT

THIS DEBTOR IN POSSESSION FINANCING AGREEMENT (this "Agreement") is entered into effective as of September __, 2011, between GATEWAY METRO CENTER, LLC, a California limited liability company ("Debtor" or "Gateway Metro," in its capacity of debtor in possession and representative of the bankruptcy estate), on the one hand, and FLYING TIGERS LLC, a California limited liability ("Lender"), on the other hand.

WHEREAS, on September 6, 2011, Gateway Metro (i) commenced a case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), identified as *In re Gateway Metro Center, LLC* (Case No. _____), and (ii) has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor in possession; and

WHEREAS, the Debtor and Lender wish to enter into an agreement whereby Lender agrees to provide the Debtor a debtor in possession financing facility, on a secured basis, of up to $350,000 (the "DIP Loan"), to be used by the Debtor to pay reasonable and necessary (1) costs associated with the operation of the Debtor during the pendency of the Bankruptcy Case, and (2) fees and expenses of professionals employed by the Debtor (the "Debtor's Professionals") that are allowed and approved by the Bankruptcy Court.

NOW, THEREFORE, for valuable consideration, the receipt of which is hereby acknowledged, the parties do hereby agree as follows:

1.    The Credit Facility.  Subject to the terms and conditions of this Agreement, and subject to all orders of the Bankruptcy Court, Lender agrees to make the DIP Loan to the Debtor as requested in accordance with the terms of this Agreement.

(a)    Amounts borrowed pursuant to this Agreement may be repaid at any time during the term of this Agreement without penalty or premium of any kind.

(b)    All amounts borrowed and owing under the DIP Loan shall become due and payable on the date that is the earliest of (i) the effective date of a plan of reorganization in the Chapter 11 Case confirmed by an entered order of the Bankruptcy Court, (ii) December 31, 2012, or (iii) the occurrence of an Event of Default (as defined in paragraph 5 herein) (the "Final Maturity Date").  Notwithstanding the foregoing, to the extent that any fees and expenses of the Debtor's Professionals, that the Debtor is obligated to pay, have not been approved by the Bankruptcy Court as of the Final Maturity Date, the estimated amount of such fees and expenses shall be advanced to the Debtor on or before the Final Maturity Date and held by the Debtor and paid to the Debtor's Professionals within five (5) days of entry of an order of the Bankruptcy Court allowing and approving such fees and expenses.  Any such amount reserved but not paid to the Debtor's Professionals shall be paid to the Lender, plus interest at the rate set forth in this Agreement.

(c)    The proceeds of the DIP Loan shall be used, subject to the Bankruptcy Code and any order of the Bankruptcy Court, for the purposes set forth herein only.

1

(d)      The DIP Loan shall be evidenced by (1) a single promissory note (the "Note,") and (2) a junior Deed of Trust With Assignment of Rents (the "Deed," together with the Note, and this Agreement, the "DIP Loan Documents") on (a) the property commonly known as Gateway Metro Center, located at 3452 East Foothill Blvd., Pasadena, CA 91107 and (b) the approximately 7,669 square feet of land immediately abutting Gateway Metro Center in substantially the same form as set forth in Exhibits 1 and 2, respectively, hereto, duly executed on behalf of the Debtor, dated as of the effective date of this Agreement, and delivered and made payable to the order of Lender in a principal amount of up to $350,000 (the "Maximum Amount").  The Deed shall be subordinate to existing liens and any replacement liens granted in connection with the Debtor's use of the cash collateral of Allstate Life Insurance Company or Flying Tigers LLC, as approved by the Bankruptcy Court.

(e)      Following the (i) Effective Date (defined in paragraph 14 herein), and (ii) entry by the Bankruptcy Court of an order allowing and approving, either on an interim or a final basis, the fees and expenses of the Debtor's Professionals, and to the extent that the Debtor does not have sufficient funds to pay the fees and expenses of the Debtor's Professionals, Debtor shall, within five (5) days of entry of the Bankruptcy Order, send a written request to Lender requesting that Lender advance to Debtor and pay to the Debtor's Professionals, on behalf of the Debtor, funds to pay all fees and expenses of the Debtor's Professionals in the amount allowed and approved by the Bankruptcy Court, and, within five (5) business days of the date of such request, Lender shall advance to Debtor and pay to the Debtor's Professionals, on behalf of the Debtor, such fees and expenses; provided that Lender shall not be obligated to advance any amounts to the extent the total amount advanced under the DIP Loan exceeds the Maximum Amount at any time.

(f)      Following the Effective Date and, to the extent that the Debtor does not have sufficient funds to pay reasonable and necessary costs of operation as set forth in any budget submitted to the Bankruptcy Court in connection with the use the cash collateral of Allstate Life Insurance Company or Flying Tigers LLC, the Debtor shall send a written request to Lender requesting that Lender advance to Debtor funds to pay such reasonable and necessary costs and, within five (5) business days of the date of such request, Lender shall, at its sole discretion, advance to Debtor such fees and expenses.

(g)      The Debtor hereby unconditionally promises to pay to Lender the then unpaid principal amount of the DIP Loan on the Final Maturity Date.  The Debtor hereby further agrees to pay interest on the unpaid principal amount of the DIP Loan from the Date of this Agreement until payment in full thereof on the Final Maturity Date and at the rates per annum set forth in the Note.

2.      Administrative Priority.  Pursuant to Bankruptcy Code section 364(c)(1) and as provided for in the Bankruptcy Court order approving this Agreement and the DIP Loan, the Debtor agrees that all obligations of the Debtor under this Agreement shall constitute allowed "super-priority" administrative expenses in the Chapter 11 Case, having priority over all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b).

2

3.    <u>Representations and Warranties of the Debtor</u>. The Debtor hereby represents and warrants to Lender as follows:

(a)    The Debtor (i) is a limited liability company duly organized, validly existing and in good standing under the laws of California; and (ii) subject to the entry by the Bankruptcy Court of an order(s) approving the DIP Loan, has the power and authority to execute, deliver and perform the obligations under the DIP Loan Documents and to consummate the transactions contemplated thereby.

(b)    The DIP Loan Documents have been duly executed and delivered by the Debtor and, subject to the entry of a Bankruptcy Court order approving all such DIP Loan Documents, constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms, except as enforceability may be limited by bankruptcy and other laws affecting the rights and remedies of creditors generally and general principles of equity.

4.    <u>Representations and Warranties of Lender</u>.    Lender hereby represents and warrants to the Debtor as follows:

(a)    Lender is a limited liability company duly organized, validly existing and in good standing under the laws of California.

(b)    Lender has the power and authority to execute, deliver and perform the obligations under the DIP Loan Documents and to consummate the transactions contemplated thereby.

5.    <u>Event of Default</u>.    An "Event of Default" shall be deemed to have occurred or exist under this Agreement upon the occurrence and/or existence of any of the following conditions or events:

(a)    The Debtor shall fail to pay the principal of or interest on the amount owing by the Debtor to Lender under the DIP Loan when due, or within ten (10) days thereafter; or

(b)    The appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of the Debtor's businesses or the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or

(c)    The Bankruptcy Court enters an order granting any party relief from the automatic stay to exercise the party's rights and remedies against the Debtor or any of its assets; or

(d)    The Chapter 11 Case is dismissed without the Lender's consent; or

(e)    Any party threatens to file or files any adversary proceeding, contested matter, suit, action or proceeding against the Lender related to the Debtor or this Agreement in any state or federal court, including the Bankruptcy Court; or

(f)    The Debtor proposes to grant, or the Court approves, any subsequent lien on the assets that secures the DIP Loan; or

(g)    Any party proposes a plan of reorganization for the Debtor without the prior written consent of the Lender or any plan of reorganization that has not been approved by the Lender is confirmed by the Bankruptcy Court.

3

6.    <u>Remedies</u>.  Subject to the terms and conditions of the DIP Loan Documents, upon the occurrence of any Event of Default, Lender (a) may give notice to the Debtor declaring all outstanding obligations under the DIP Loan to be due and payable, whereupon all such obligations then outstanding shall immediately become due and payable, without further notice or demand, (b) may exercise any and all rights and remedies available to it as a result thereof, and (c) Lender shall not advance any additional funds except in its sole and absolute discretion, provided, however, that Lender shall be required to advance funds to pay all fees and expenses of the Debtor's Professionals incurred through the date of the Event of Default in the amount approved and allowed by the Bankruptcy Court.

7.    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Debtor and Lender, to the extent that any such party is affected thereby in the case of an amendment, and only with the written consent of the waiving party in the case of a waiver; provided, however, that any material amendment to this Agreement shall require the approval of the Bankruptcy Court.

8.    <u>Entire Agreement</u>. The DIP Loan Documents and the Bankruptcy Court order(s) authorizing the same constitute the entire agreement of the parties concerning the subject matter hereof and thereof, all prior discussions, proposals, negotiations and understandings having been merged herein and therein.

9.    <u>Successors</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Debtor and Lender. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective permitted successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

10.    <u>Assignment</u>.  Lender may sell, assign, give, pledge, hypothecate or transfer the Note.  The Lender shall promptly give notice of any such transfer to the Debtor pursuant to the notice provisions set forth paragraph 13 below.  Debtor may only sell, assign, give, pledge, hypothecate or transfer the Note with Lender's prior written consent in Lender's sole discretion.

11.    <u>Nonrecourse</u>.  This Agreement is a non recourse obligation of Borrower and under no circumstances will any director, officer, principals, shareholder, member, manager, partner, employee, agent (including legal counsel) or affiliate of the Borrower have any personal responsibility for any liability or obligation of the Borrower (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Lender will be limited to the Borrower and the assets of the Borrower as they may exist from time to time.

12.    <u>Governing Law</u>.  This Agreement shall be governed by and construed and interpreted in accordance with the law of the State of California, without regard to that state's conflict of laws principles. All disputes between the parties hereto, whether sounding in contract, tort, equity or otherwise, shall be resolved only by the Bankruptcy Court having jurisdiction over the Chapter 11 Case upon motion by a party in accordance with applicable rules, and the courts

4

to which an appeal therefrom may be taken. All parties hereto waive any objections to the location of the above-referenced courts, including but not limited to any objection based on lack of jurisdiction, improper venue, or *forum non-conveniens*. Notwithstanding the foregoing, any party obtaining any order or judgment in any of the above referenced courts may bring an action in a court in another jurisdiction in order to enforce such order or judgment. If any amounts owing under this Agreement are not paid when due, Debtor promises to pay all costs and expenses, including reasonable attorneys' fees incurred by Lender in the collection or enforcement of this Agreement.

13.    <u>Notices</u>. Any notice under this Agreement shall be given in writing and shall be addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by written notice to the other parties.

> To Debtor:
> Gateway Metro Center, LLC
> c/o Pacific Starr Group, LLC
> Attn: John F. Pipia
> 3452 East Foothill Boulevard
> Suite 1170A
> Pasadena, CA 91107
> Fax: 626-356-0855
>
> with a copy to:
>
> Peitzman, Weg & Kempinsky LLP
> 2029 Century Park East, Suite 3100
> Los Angeles, CA 90067
> Attn: Lorie A. Ball
> Fax: 310-552-3101
>
> To Lender:
> Flying Tigers, LLC
> Attn: Betty W. Ma
> 3452 East Foothill Boulevard
> Suite 1170A
> Pasadena, CA 91107
> Fax: 626-356-0855

14.    <u>Effectiveness</u>. This Agreement shall be conditioned upon, and only become effective upon, (i) signature by all parties hereto and (ii) entry by the Bankruptcy Court of an order authorizing the DIP Loan and the Debtor's entry into the DIP Loan Documents, which order shall not be subject to any stay (the "Effective Date").

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first set forth above.

GATEWAY METRO CENTER, LLC,
A California limited liability company

By:    Pacific Starr Group II, LLC, a California
       limited liability company, its manager

       By:    Pacific Starr Group, LLC
            A California limited liability company,
            its managing member

            By: _____
               Name: John F. Pipia
               Title: Managing Member


FLYING TIGERS, LLC,
A California limited liability company

By:


_____
Name: Betty W. Ma
Title: Senior Vice President and Secretary

6

**Exhibit A**
**Page No. 24**

**Exhibit 1**

**FORM OF PROMISSORY NOTE**

up to $350,000                                               September __, 2011

FOR VALUE RECEIVED, the undersigned, Gateway Metro Center, LLC, a California limited liability company (the "Borrower"), hereby promises to pay to the order of Flying Tigers, LLC, a California limited liability company (the "Lender"), at 3452 East Foothill Boulevard, Suite 1170A, Pasadena, California 91107, or at such other address as may be specified in writing by the Lender to the Borrower, the principal sum of three hundred and fifty thousand ($350,000) (or such lesser amount as shall equal the aggregate unpaid principal amount of the DIP Loan made by the Lender to the Borrower under the DIP Agreement (as herein defined)), and to pay simple interest on the unpaid principal amount owing hereunder at the rate of five percent (5%) per annum (the "Contract Rate") as well as reasonable costs and expenses.  The entire principal balance, and all accrued and unpaid interest, shall be due and payable on the date provided in the DIP Agreement.  The term of this Note may be extended by mutual agreement of Lender and Borrower in their sole discretion.

If there occurs an Event of Default, under this Note or the DIP Agreement, then the unpaid principal amount of this Note, and all accrued and unpaid interest thereon shall bear interest at the Contract Rate plus three percent (3%) per annum compounded monthly ("Default Rate") from the date of expiration of any applicable cure or grace period until such time, if any, as the Event of Default is cured and this Note and the DIP Agreement are reinstated as permitted by applicable law, or otherwise until such time as the unpaid principal amount of this Note – and all other indebtedness evidenced by this Note and the DIP Agreement are fully repaid, whichever is earlier.

The date and amount of each advance under the DIP Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender; provided, however, that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make any payment when due of any amount owing under the DIP Agreement or hereunder.

Each payment shall be credited first to Lender's unpaid fees and expenses, then to the interest accrued, and the remainder to the principal.

This Note is the Promissory Note referred to in the Debtor In Possession Financing Agreement dated as of September __, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Agreement"), by and between the Borrower and the Lender and shall be subject to the terms and conditions set forth in the DIP Agreement.  Capitalized terms used and not defined herein shall have their respective meanings given them in the DIP Agreement.

7

The DIP Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for optional prepayments of the DIP Loan upon the terms and conditions specified therein.

Lender may sell, assign, give, pledge, hypothecate or transfer the Note.  Borrower may only sell, assign, give, pledge, hypothecate or transfer the Note with Lender's prior written consent in Lender's sole discretion.

This Note is a non recourse obligation of Borrower and under no circumstances will any director, officer, shareholder, member, principals, manager, partner, employee, agent (including legal counsel) or affiliate of the Borrower have any personal responsibility for any liability or obligation of the Borrower (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Note or otherwise of the Lender will be limited to the Borrower and the assets of the Borrower as they may exist from time to time.

This Note shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts executed and fully performed in such state.

The Borrower hereby waives presentment for payment, demand, notice of demand, notice of non-payment, protest, notice of protest and all other similar notices.

Time is of the essence for this Note.

If any amounts owing under this Agreement are not paid when due, Borrower promises to pay all costs and expenses, including reasonable attorneys' fees incurred by Lender in the collection or enforcement of this Agreement.

This Note is secured by a Deed of Trust With Assignment of Rents dated concurrently herewith.

Any notice under this Agreement shall be given in writing and shall be addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by written notice to the other parties.

> To Borrower:
> Gateway Metro Center, LLC
> c/o Pacific Starr Group, LLC
> Attn: John F. Pipia
> 3452 East Foothill Boulevard
> Suite 1170A
> Pasadena, CA 91107
> Fax: 626-356-0855
>
> with a copy to:
>
> Peitzman, Weg & Kempinsky LLP
> 2029 Century Park East, Suite 3100
> Los Angeles, CA 90067

8

Attn:  Lorie A. Ball
Fax:  310-552-3101

To Lender:
Flying Tigers, LLC
Attn:  Betty W. Ma
3452 East Foothill Boulevard
Suite 1170A
Pasadena, CA 91107
Fax: 626-356-0855


     IN WITNESS WHEREOF, the undersigned has executed and delivered this Note as of
the date first written above.

[Next page is signature page]

**Exhibit A**
**Page No. 27**

GATEWAY METRO CENTER, LLC,
A California limited liability company

By:    Pacific Starr Group II, LLC, A California
       limited liability company, its manager

       By:    Pacific Starr Group, LLC
              A California limited liability company,
              its managing member

              By: _____
                  Name: John F. Pipia
                  Title: Managing Member

10

RECORDING REQUESTED BY

Matthew Dryer

AND WHEN RECORDED MAIL TO:

PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

APN: 5757-030-041          Order #: _____          Escrow #: _____

# DEED OF TRUST WITH ASSIGNMENT OF RENTS (LONG FORM)

**THIS DEED OF TRUST**, made _____, between  Gateway Metro Center, LLC,
a California limited liability company _____ herein called TRUSTOR

whose address is  3452 East Foothill Blvd., Suite 1170A _____,

_____Pasadena_____          (Number and Street)          CA 91107_____
        (City)                                                   (State and Zip)

Chicago Title Insurance Company _____, a California corporation, herein called TRUSTEE, and

Flying Tigers LLC, 3452 East Foothill Blvd., Suite 1170A, Pasadena, CA 91107 _____, herein called BENEFICIARY,

WITNESSETH: That Trustor grants to Trustee in trust, with Power of Sale, that property in the City of  Pasadena ,
County of  Los Angeles _____, State of California, described as:

        See Exhibit A

together with rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred
upon Beneficiary to collect and apply such rents, issues and profits for the purpose of securing (1) payment of the sum of
$ up to 350,000.00 _____, with interest thereon according to the terms of a promissory note or notes of even date herewith made to
Trustor, payable to order of Beneficiary, and extensions or renewals thereof, (2)the performance of each agreement of Trustor
incorporated by reference or contained herein and (3) payment of additional sums and interest thereon which may hereafter be loaned
to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of
Trust.

A.  To protect the security of this Deed of Trust, Trustor agrees:

    1)To keep said property in good condition and repair, not to remove or demolish any building thereon; to complete or restore promptly
and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all
claims for labor performed and materials furnished therefor, to comply with all laws affecting said property or requiring any alterations or
improvements to be made thereon, not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in
violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may
be reasonably necessary, the specific enumerations herein not excluding the general.

2) To provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary.   The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor.   Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

4) To pay, at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all cost, fees and expenses of this Trust

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may; make or do the same is such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B.  It is mutually agreed:

1) That any award in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require payment when due of all other sums so secured or to declare default for failure so to pay.

3) That at any time or from time to time, without liability therefore and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easements thereon, or join in any extension agreement or any agreement subordinating the lien or charge hereof.

4) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.   The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right; prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable.  Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine.   The entering upon and taking possession of said property, the collecting of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice shall cause to be filed for record.   Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of said having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for case in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement.   Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied.   The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.   Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of trustee and of this Trust, including costs of evidence of title in connection with sale, Trustee shall apply to proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

7)  Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties.  Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.  The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein.  In this Deed, whenever the context so requires the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

9)  That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law.  Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

10) Borrower requests that copies of the notice of default and notice of sale be sent to Borrower's address as shown above.

Lender requests that copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Lender's address, as set forth on page one of this Deed of Trust, as provided by Section 2924(b) of the California Civil Code.

If the Trustor/Grantor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Beneficiary being first had and obtained, Beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any Note evidencing the same, immediately due and payable.

---

Trustor  GATEWAY METRO CENTER, LLC,                              Trustor
    A California limited liability company
    By: Pacific Starr Group II, LLC, A California limited liability company, its manager
    By: Pacific Starr Group, LLC, A California limited liability company, its managing member
    By: John F. Pipia, Managing Member

---

Trustor                                                          Trustor

Dated: _____

STATE OF CALIFORNIA
COUNTY OF _____

On _____, before me,
_____, Notary Public, personally appeared
_____

_____, who proved to me on the basis of satisfactory evidence to

be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that

he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on

the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____ (Notary Seal)
Signature

# EXHIBIT A

TRUSTOR, in consideration of the indebtedness herein recited and the trust herein created, hereby irrevocably grants, conveys, transfers and assigns to Trustee, its successors and assigns, in trust, with power of sale and right of entry and possession, all of Trustor's estate, right, title and interest in, to and under that certain real property located in Los Angeles County, California, more particularly described in Schedule 1 and Schedule 2 attached hereto and incorporated herein by this reference (the "Land");

TOGETHER with all of Trustor's  now or hereafter acquired estate, right, title and interest in, to and  under all buildings, structures, improvements and fixtures now existing or hereafter erected on the Land and all right, title and interest, if any, of Trustor in and to the streets and roads, opened or proposed, abutting the Land to the center lines thereof, and strips within or adjoining the Land, the air space and right to use said air space above the Land, all rights of ingress and egress on or within the Land, all easements, rights and appurtenances thereto or used in connection with the Land, including, without limitation, all lateral support, alley and drainage rights, all revenues, income, rents, cash or security deposits, advance rental deposits, and other benefits thereof or arising from the use or enjoyment of all or any portion thereof, all interests in and rights, royalties and profits in connection with all minerals, oil and gas and other hydrocarbon substances thereon or therein, and water stock, all options to purchase or lease, all development or other rights relating to the Land or the operation thereof, or used in connection therewith, including all Trustor's right, title and interest in all fixtures, attachments, partitions, machinery, equipment, building materials, appliances and goods of every nature whatever now or hereafter located on, or attached to, the Land, all of which, including replacements and additions thereto, shall, to the fullest extent permitted by law and for the purposes of this Deed of Trust, be deemed to be real property and, whether affixed or annexed thereto or not, be deemed conclusively to be real property; and Trustor agrees to execute and deliver, from time to time, such further instruments and documents as may be required by Beneficiary to confirm the legal operation and effect of this Deed of Trust on any of the foregoing.  All of the foregoing property described in this section (the "Improvements") together with the Land, shall be hereinafter referred to as the "Property".

# Schedule 1
## LEGAL DESCRIPTION

PARCEL 1:

THE SOUTHERLY 30.00 FEET OF THE NORTHERLY 347.00 FEET OF LOT 1 OF TRACT NO. 901, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 174 AND 175 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, TOGETHER WITH THE NORTHERLY 347.00 FEET TO THE WEST HALF OF LOT 2 OF SAID TRACT NO. 901.

EXCEPT THE NORTHERLY 21.00 FEET OF THE WEST HALF OF SAID LOT 2.

PARCEL 2:

THE SOUTHERLY 237.00 FEET, MEASURED ALONG THE WESTERLY LINE, OF THE EAST HALF OF LOT 2 OF TRACT NO. 901, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 174 AND 175 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE EASTERLY 12.32 FEET OF SAID LAND.

PARCEL 3:

THE EASTERLY HALF OF LOT 2 OF TRACT NO. 901, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 174 AND 175 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 237 FEET THEREOF.

ALSO EXCEPT THE NORTHERLY 200.00 THEREOF.

ALSO EXCEPT FROM THE REMAINDER OF SAID LAND THE EASTERLY 12.32 FEET THEREOF.

PARCEL 4:

THE EAST 12.32 FEET OF LOT 2 AND THE WEST 86.00 FEET OF LOT 3 OF TRACT NO. 901, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 174 AND 175 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

EXCEPT THE NORTH 323 FEET OF SAID LOTS 2 AND 3.

LOLDESC1 - 04/28/89

Schedule 2
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF THE NORTHERLY 30.00 FEET OF THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY'S 60.00 FOOT WIDE PROPERTY, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON MAP OF TRACT NO. 901, RECORDED IN BOOK 16, PAGES 174 AND 175 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND AS ACQUIRED BY THE STATE OF CALIFORNIA IN PARCEL 1 OF QUITCLAIM DEED RECORDED MARCH 19, 1991 AS INSTRUMENT NO. 91-386291 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BOUNDED ON THE WEST BY THE SOUTHERLY PROLONGATION OF THE EAST LINE OF THE WEST HALF OF LOT 2 OF SAID TRACT NO. 901 AND ON THE EAST BY SOUTHERLY PROLONGATION OF THE EAST LINE OF THE WEST 86.00 FEET OF LOT 3 OF SAID TRACT NO. 901.

EXCEPTING THEREFROM THAT PORTION LYING SOUTHERLY OF THAT CERTAIN LINE DESCRIBED AS N 85° 55' 45" E. 321.46 FEET IN DEED, STATE PARCEL 67550, FINAL ORDER CONDEMNATION, SUPERIOR COURT CASE NO. C40882, IN AND FOR SAID COUNTY, A CERTIFIED COPY OF WHICH WAS RECORDED AUGUST 26, 1975, AS INSTRUMENT NO. 2963, IN BOOK D6775, PAGE 657 OF OFFICIAL RECORDS IN SAID COUNTY.

END OF LEGAL DESCRIPTION

# EXHIBIT B

Howard J. Weg (State Bar No. 91057)
*hweg@pwkllp.com*
Lorie A. Ball (State Bar No. 210703)
*lball@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile:  (310) 552-3101

Proposed Counsel for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No: |
| GATEWAY METRO CENTER, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor in Possession. | **ORDER UNDER 11 U.S.C. §§ 363 AND 364: (A) AUTHORIZING DEBTOR TO INCUR POST-PETITION INDEBTEDNESS, (B) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND (C) GRANTING SECURITY INTERESTS** |
| | **Hearing:** |
| | Date: <br> Time: <br> Place: |

The Motion For Order Under 11 U.S.C. §§ 363 And 364: (A) Authorizing Debtor To Incur Post-Petition Indebtedness, (B) Granting Superpriority Administrative Expense Status, And (C) Granting Security Interests (the "Motion"), filed by Gateway Metro Center, LLC  (the "Debtor"), came on for hearing before the Honorable [       ], United States Bankruptcy Judge, on [       , 2011], at [10:00 a.m.] (the "Hearing").  Appearances were made as reflected in the Bankruptcy Court's record.  Capitalized terms used herein shall have the meanings ascribed to them in the Motion, unless otherwise defined.

Pursuant to the Motion, the Debtor requests an order (a) authorizing the Debtor to obtain

**Exhibit B**
**Page No. 35**

post-petition financing (the "DIP Loan") from Flying Tigers LLC, a California limited liability

company ("Lender"), pursuant to a Debtor In Possession Financing Agreement (the "DIP

Agreement"), (b) granting superpriority administrative expense status and (b) granting a secured

interest in certain property of the Debtor's Estate.

After consideration of the Motion and accompanying supporting papers, the arguments of

counsel, the files and records in this chapter 11 case, and finding that: (a) this is a core proceeding; (b)

notice of the Motion was appropriate under the circumstances; (c) given the Debtor's current financial

condition, it is uncertain the Debtor would be able to pay the reasonable and necessary (1) costs incurred

during the pendency of the case and (2) fees and expenses of the Debtor's Professionals as approved and

allowed by the bankruptcy court and the Debtor is otherwise unable to obtain unsecured credit allowable

under Bankruptcy Code § 503(b)(1) as an administrative expense, and financing on a post-petition basis

is not otherwise available without the Debtor providing those protections afforded to Lender as

described in the DIP Agreement; (d) the terms of this Order, including, without limitation, the terms of

the DIP Loan and DIP Agreement are fair and reasonable and reflect the Debtor's exercise of prudent

business judgment; (e) no opposition to the Motion was filed by any party; and (e) entry of this Order is

in the best interests of the Debtor's estate and its creditors, and sufficient cause appearing, it is hereby

**ORDERED THAT:**

A.    The Motion is **GRANTED**.

B.    The Debtor is authorized to obtain the post-petition financing from Lender, in an

amount up to $350,000, subject to the terms of this Order and to the terms and conditions of the DIP

Agreement.

C.    The DIP Agreement is approved.  The Debtor is authorized to enter into, execute and

perform under the DIP Agreement, and to execute and deliver to Lender such additional documents

to implement the terms or effectuate the purposes of the DIP Agreement.

D.    The proceeds of the DIP Loan shall be used, if necessary, by the Debtor for

reasonable and necessary (1) costs incurred during the pendency of the case in accordance with any

budget submitted in connection with the Cash Collateral Motion and (2) fees and expenses of the

Debtor's Professionals during the pendency of the bankruptcy case and as allowed and approved by

**Exhibit B
Page No. 36**

the Bankruptcy Court

E.      Following entry by the Bankruptcy Court of an order approving, either on an interim or a final basis, the fees and expenses of the Debtor's Professionals, and to the extent that the Debtor does not have sufficient funds to pay the fees and expenses of the Debtor's Professionals, Lender shall, upon written request from the Debtor sent to Lender, advance to the Debtor and pay directly to the Debtor's Professionals, on behalf of the Debtor, funds to pay all fees and expenses of the Debtor's Professionals in the amount approved by the Bankruptcy Court.

F.      Amounts borrowed pursuant to the DIP Agreement may be repaid by the Debtor at any time during the term of the DIP Agreement without penalty or premium of any kind.  The Debtor shall repay to Lender the then unpaid principal amount of the DIP Loan, on the date that is the earliest of (i) the effective date of a plan of reorganization in the Debtor's chapter 11 case confirmed by an order of the Bankruptcy Court, (ii) December 31, 2012, or (iii) the occurrence of an Event of Default.

G.      Pursuant to Bankruptcy Code section 364(c)(1), all obligations of the Debtor under the DIP Agreement shall constitute allowed "superpriority" administrative expenses in the chapter 11 case, having priority over all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b).

H.      Pursuant to Bankruptcy Code section 364(c)(2) and (3), all obligations of the Debtor under the DIP Agreement shall be secured by (1) a junior secured lien on Gateway Metro Center and (2) a junior secured lien on the Land.

I.      An "Event of Default" shall be deemed to have occurred or exist under the DIP Agreement upon the occurrence and/or existence of any of the following conditions or events: (i) the Debtor shall fail to pay the principal owing by the Debtor to Lender under the DIP Loan when due, or within ten (10) business days thereafter; or (ii) the appointment in the chapter 11 case of a trustee or of any examiner having expanded powers to operate all or any part of the Debtor's businesses, or the conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or (iii) the

**Exhibit B
Page No. 37**

confirmation of a plan of reorganization, or the entry of an order confirming a plan of reorganization, that does not require repayment in full in cash of all obligations under the DIP Agreement on the effective date of such plan of reorganization.

###